IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NAKESHUA A. ROBERTS, | ) | CASE NO. 4:25-cv-00764-PAB |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

### I.  Introduction

Plaintiff, Nakeshua Roberts ("Roberts") seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Roberts' application for SSI be affirmed.

### II.  Procedural History

Roberts filed for SSI on July 28, 2022, alleging a disability onset date of January 1, 2014. (Tr. 179). The claims were denied initially and on reconsideration. (Tr. 64-72, 74-82). She then requested a hearing before an ALJ. (Tr. 115). Roberts (represented by counsel) and a vocational expert ("VE") testified before the ALJ on January 22, 2024. (Tr. 32-62). On February 12, 2024,

the ALJ issued a written decision finding Roberts not disabled. (Tr. 14-27). The Appeals Council denied her request for review on February 10, 2025, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981). Roberts timely filed this action on April 16, 2025. (ECF Doc. 1).

**III.     Evidence**

    **A.     Personal, Educational, and Vocational Evidence**

Roberts was 48 years old on her application date, making her a younger individual according to Agency regulations. (*See* Tr. 26). She graduated from high school. (*See id.*). In the past, she worked as a customer service representative, and as a hair and nail technician. (Tr. 25).

    **B.     Relevant Medical Evidence[1]**

On May 29, 2020, Roberts presented to Heather Dawson, APRN-CNP for mental health treatment of her anxiety, depression, and bipolar disorder. (Tr. 518-22). Roberts reported anxiety ranging from seven to ten out of ten, and having two panic attacks that week. (Tr. 518). She denied suicidal or homicidal ideations, although she also acknowledged some thoughts of self-harm and was hiding sharp objects from herself and her son. (*Id.*). She reported PTSD symptoms, including nightmares, flashbacks, anger, irritability, and hypervigilance. (Tr. 519). On examination, Roberts had poor insight, judgment, attention span, and concentration, but findings were otherwise normal. (*Id.*). CNP Dawson recommended Roberts attend an assessment to start counseling, and to follow up with her primary care doctor for physical symptoms. (*Id.*). She continued Roberts on Klonopin 1 mg three times daily (with plan to wean); Latuda 60 mg

---

[1] Roberts only raises error with the ALJ's consideration of her mental health limitations in forming the RFC. (*See* ECF Doc. 7, pp. 8-14). All other issues are deemed waived. *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his merits brief). I therefore only provide a review of the relevant mental health evidence; I do not provide review of physical medical evidence, *e.g.*, of Roberts' fibromyalgia or back pain.

2

for mood stabilization; Vistaril 50 mg three times daily, as needed for breakthrough anxiety; Lamictal 150 mg; and Benztropine 1 mg twice daily, for restlessness. (*Id.*).

On October 4, 2021, Roberts followed with Kimothy Kane, APRN-CNP for medication management. (Tr. 563-72). She reported that her anxiety and depression had been stable when she takes her medications. (Tr. 553). She rated her anxiety at eight on a ten-point scale and her depression at ten on a ten-point scale. (*Id.*). She reported feelings of guilt, low self-worth, feeling down and depressed, hopeless, having little interest and pleasure in doing things, and poor appetite, and crying spells. (*Id.*). She denied suicidal and homicidal ideations, paranoia, and audio or visual hallucinations. (*Id.*). On examination, CNP Kane noted anhedonia and that Roberts was anxious, and that she had poor sleep; all other examination results were noted as normal. (Tr. 555). CNP Kane continued all medications. (Tr. 571-72).

On November 2, 2021, Roberts followed with CNP Kane for medication management. (Tr. 553-62). She reported that she was working to regulate her son's medications and once that was accomplished she would have more stable moods herself. (Tr. 563). She rated her anxiety at nine on a ten-point scale. (*Id.*). She denied suicidal ideation, paranoia, and audio or visual hallucinations. (*Id.*). On examination, CNP Kane noted anhedonia and that Roberts was anxious; all other examination results were noted as normal. (Tr. 565). CNP Kane continued all medications. (Tr. 571-72).

On December 2, 2021, Roberts followed with CNP Kane for medication management. (Tr. 542-51). She reported that she was recovering from COVID-19 and had missed her medications during her illness. (Tr. 542). She reported feelings of guilt, low self-worth, feeling down and depressed, hopeless, having little interest and pleasure in doing things, poor appetite, and crying spells. (*Id.*). She denied suicidal and homicidal ideations, paranoia, and audio or

3

visual hallucinations. (*Id.*). On examination, CNP Kane noted anhedonia and that Roberts was anxious, and that her recovery from COVID-19 had elevated her depression and anxiety; all other examination results were noted as normal. (Tr. 544). CNP Kane continued all medications. (Tr. 544-45).

On December 30, 2021, Roberts followed with CNP Kane for medication management. (Tr. 531-41). She reported anxiety ranging from nine to ten out of ten, and having daily panic attacks lasting five minutes. (Tr. 531). She reported feelings of guilt, low self-worth, feeling down and depressed, hopeless, having little interest and pleasure in doing things, poor appetite, and crying spells. (*Id.*). She denied suicidal and homicidal ideations and paranoia but reported seeing things in her peripheral vision. (*Id.*). She was getting poor, broken sleep with nightmares. (*Id.*). On examination, CNP Kane noted anhedonia and that Roberts was anxious; all other examination results were noted as normal. (Tr. 533). CNP Kane continued all medications. (Tr. 533-34).

On March 7, April 8, and June 22, 2022, Roberts followed up with CNP Kane for medication management. (Tr. 602-22). Roberts reported her functioning was not difficult; she rated depression and anxiety up to ten on a ten-point scale; she had panic attacks at times, lasting for a few minutes up to an hour. (Tr. 602, 609, 616). On examination, CNP Kane noted anhedonia and hallucinations, and that Roberts was anxious; all other examination results were noted as normal. (Tr. 603, 610, 617). Roberts reported symptom improvements and that she was able to handle life stressors. (Tr. 607). CNP Kane continued all medications. (Tr. 607, 614, 621).

On July 19, 2022, Roberts followed up with CNP Kane for medication management. (Tr. 594-601). Roberts reported depression and anxiety as a ten on a ten-point scale; she had panic attacks which she was controlling but her anxiety attacks often required an emergency

4

department visit. (Tr. 594). On examination, CNP Kane noted hallucinations, anhedonia, and that Roberts was anxious; all other examination results were noted as normal. (Tr. 595). CNP Kane decreased Seroquel for sleep but continued all other medications. (Tr. 600).

On August 15, 2022, Roberts followed up with CNP Kane for medication management. (Tr. 587-93). Roberts reported depression and anxiety as a nine or ten on a ten-point scale; she had panic attacks which she was controlling and was compliant with her medications. (Tr. 587). On examination, CNP Kane noted auditory hallucinations, anhedonia, and that Roberts was anxious; all other examination results were noted as normal. (Tr. 588). CNP Kane increased Seroquel for sleep and to curb voices/music Roberts hears at night but continued all other medications. (Tr. 592-93).

On September 14, 2022, Roberts followed up with CNP Kane for medication management. (Tr. 580-86). Roberts reported depression as an eight on a ten-point scale and anxiety as a ten on a ten-point scale; she had panic attacks three times per week lasting two to three minutes each, which she was controlling. (Tr. 580). On examination, CNP Kane noted anhedonia and that Roberts was anxious, and that she had fatigue and increased depression and anxiety; all other examination results were noted as normal. (Tr. 581). Roberts reported she was extremely tired and fatigued; CNP Kane indicated a plan to rule out over-medicating. (Tr. 585). CNP Kane continued Klonopin at the same dose but reduced all other medications. (*Id.*).

On October 21, 2022, Roberts followed up with CNP Kane for medication management. (Tr. 695-703). Roberts reported depression and anxiety as up to ten on a ten-point scale; she also reported multiple panic attacks and that she sometimes hears whispers or music. (*Id.*). On examination, CNP Kane noted anhedonia and that Roberts was anxious; all other examination

5

results were noted as normal. (Tr. 696). CNP Kane increased Latuda but continued all other medications. (Tr. 701).

On October 21, November 18, and December 21, 2022, Roberts followed up with CNP Kane for medication management. (Tr. 681-94). Roberts reported depression and anxiety as up to ten on a ten-point scale; she also reported multiple panic attacks. (Tr. 681, 688, 695). On examination, CNP Kane noted anhedonia, paranoia, and that Roberts was anxious; all other examination results were noted as normal. (Tr. 682, 689). CNP Kane continued all medications, noting that most symptoms were situational. (Tr. 686, 693).

On January 20, 2023, Roberts met with CNP Kane for medication management. (Tr. 674-80). She reported worsening of symptoms, with depression and anxiety rated as ten on a ten-point scale. (*Id.*). She denied suicidal and homicidal ideations, and hallucinations, but endorsed paranoia. (Tr. 675). On examination, CNP Kane noted Roberts was anxious; the examination was otherwise normal. (*Id.*). CNP Kane continued all medications. (Tr. 679).

On March 7, 2023, Roberts met with CNP Kane for medication management. (Tr. 667-73). She rated her depression and anxiety as five on a ten-point scale, and some panic attacks due to moving. (Tr. 667). She denied suicidal and homicidal ideations, hallucinations, and paranoia. (*Id.*). On examination, CNP Kane noted anhedonia and that Roberts was anxious, and that she had situational depression and anxiety due to moving; the examination was otherwise normal. (Tr. 668). CNP Kane continued all medications. (Tr. 672).

On April 6, 2023, Roberts followed up with CNP Kane for medication management. (Tr. 660-66). Roberts reported depression as an eight on a ten-point scale and anxiety as a ten on a ten-point scale; she had panic attacks daily. (Tr. 660). She denied suicidal and homicidal ideations, but reported some paranoia after a move to a new home. (*Id.*). On examination, CNP

6

Kane noted anhedonia, paranoia, and that Roberts was anxious; all other examination results were noted as normal. (Tr. 661). CNP Kane continued all medications. (Tr. 665).

On May 5, 2023, Roberts followed up with CNP Kane for medication management. (Tr. 790-96). Roberts reported depression and anxiety as a seven on a ten-point scale; she had occasional panic attacks and reported hearing things. (Tr. 790). On examination, CNP Kane noted anhedonia, and that Roberts was anxious, and that she had been off her medications for five days due to illness; all other examination results were noted as normal. (Tr. 791). CNP Kane continued all medications. (Tr. 795).

On July 7, 2023, Roberts followed up with CNP Kane for medication management. (Tr. 783-89). Roberts reported depression and anxiety as ten on a ten-point scale; she reported having panic attacks, paranoia, and hallucinations. (Tr. 783). On examination, CNP Kane noted anhedonia, hallucinations, and mood swings, and that Roberts was anxious; all other examination results were noted as normal. (Tr. 784). CNP Kane continued all medications. (Tr. 788).

On August 7, 2023, Roberts followed up with CNP Kane for medication management. (Tr. 775-81). Roberts reported depression eight to ten and anxiety as ten on a ten-point scale; she reported one to two panic attacks. (Tr. 775). On examination, CNP Kane noted anhedonia and Roberts was anxious; all other examination results were noted as normal. (Tr. 776). Roberts had missed her June appointment and reported that her symptoms increased because she has not had some of her medications. (Tr. 788). CNP Kane continued all medications. (*Id.*).

On September 11, 2023, Roberts followed up with CNP Kane for medication management. (Tr. 767-74). Roberts reported depression as a ten and anxiety as a five on a ten-point scale; she reported occasional panic attacks and some paranoia. (Tr. 767). On examination,

7

CNP Kane noted anhedonia; all other examination results were noted as normal. (Tr. 768). CNP Kane increased Effexor and continued all other medications. (Tr. 773).

On October 25, 2023, Roberts followed up with CNP Kane for medication management. (Tr. 759-65). Roberts reported depression and anxiety as an eight on a ten-point scale; she did not report any panic attacks but did report seeing shadows and hearing voices. (Tr. 759). On examination, CNP Kane noted anhedonia, hallucinations, and that Roberts was anxious; all other examination results were noted as normal. (Tr. 759-60). CNP Kane tapered Effexor and continued all medications with a note to begin taper of Latuda in two weeks. (Tr. 765).

On November 28, 2023, Roberts followed up with CNP Kane for medication management. (Tr. 752-58). Roberts reported depression and anxiety as an eight on a ten-point scale; she did not report any panic attacks but did report seeing shadows and hearing voices. (Tr. 753). On examination, CNP Kane noted anhedonia and that Roberts was anxious; all other examination results were noted as normal. (*Id.*). CNP Kane continued all medications. (Tr. 758).

C. **Medical Opinion Evidence**

On October 12, 2022, state agency reviewing psychologist Kristen Haskins, Psy.D., reviewed Roberts' file at the initial level. (Tr. 69-70). She opined that Roberts was capable of short cycle step tasks in an environment with no fast paced demand, that she was capable of interacting with others occasionally and primarily superficially, and that she could adjust to minor changes in the work setting and still complete an ordinary routine consistently on an independent basis, but that major changes would need to be introduced in advance and then gradually phased in to allow her time to adjust to the new expectations. (Tr. 70).

On November 5, 2022, Roberts attended a consultative examination by Karolis Bauza, M.D. (Tr. 635-40). Dr. Bauza noted a history of bipolar disorder that causes Roberts manic

8

episodes twice a month, that she has suicidal thoughts but denied acting on them, and that she is unable to work secondary to worrying about triggering her symptoms. (Tr. 635). Roberts also reported a history of PTSD, which causes her nightmares, auditory and visual hallucinations. (Tr. 636). Roberts reported that her PTSD affects her ability to work secondary to not liking to be around people. (*Id.*). On examination, she was oriented in all spheres, had appropriate mood, clear thought processes, normal memory, and good concentration. (Tr. 638). Dr. Bauza's opinion focused on physical function, but included opinion that Roberts had no relevant communicative limitations. (Tr. 640).

On April 6, 2023, state agency reviewing psychologist Daniel Malone, Ph.D., reviewed Roberts' file at the reconsideration level. (Tr. 79-80). He affirmed Dr. Haskins' findings. (*Id.*).

D.  **Administrative Hearing Evidence**

Roberts testified at the hearing before the ALJ on January 22, 2024. (Tr. 34). She testified that she lived with her 19-year-old daughter and 13-year-old son. (Tr. 37). She stated that she could not work because of her son's mental health issues, including autism, oppositional defiant disorder, severe ADHD, bipolar disorder, and because of her own mental health issues. (*Id.*). She does not have a driver's license, and had not driven for four or five years. (Tr. 37-38). For transportation, she either uses a car service through her insurance company or her adult son will drive her. (Tr. 39).

Her previous work had been in telecommunications customer service, assisting people in completing wire transfers. (Tr. 41-42). She also had a period of self-employment doing hair and nails. (Tr. 43).

Roberts testified that fibromyalgia, astigmatism in her left eye, and anxiety prevent her from working. (Tr. 44). She sees her primary care doctor for fibromyalgia treatment, and she

9

receives gabapentin for neuropathy. (Tr. 44-45). She described having constant stabbing pain, rendering her helpless. (Tr. 45, 51). The medication dulls the pain but does not fully relieve it. (*Id.*). She also takes medication for anxiety and panic. (Tr. 46-48). She sometimes hears voices. (*Id.*). Her panic attacks occur two to three times per week, and last 10 to 20 minutes until she can calm herself down or take one of her medications. (Tr. 54). She also has depression and experiences crying spells, has difficulty paying attention, and difficulty concentrating. (Tr. 54-55). She has trouble sleeping and sometimes will not get out of bed until late in the afternoon. (Tr. 50).

Roberts will complete some chores, such as sweeping, mopping, or laundry, until her back pains her and she needs to sit down. (Tr. 52-53). Her daughter will watch her minor son and cook the family dinner. (Tr. 51-52). Roberts will go shopping based on her daughter's list. (Tr. 53).

The VE then testified. He categorized Roberts' past work as customer service representative, DOT 211.362-010, SVP 5, skilled, sedentary; and hair and nail technician, DOT 332.271-010, SVP 6, skilled, light. (Tr. 57).

The ALJ then provided the following hypothetical: assuming an individual of Roberts' age and education, limited to light work with additional limitations of frequent ramps and stairs; no ladders, ropes, or scaffolds; frequent balance, occasional stoop, frequent kneel, occasional crouch or crawl; simple, routine, and repetitive tasks, but not at a production rate pace such as assembly line work; simple work-related decisions; occasional interaction with supervisors, coworkers, and the public, few changes in a routine work setting. (Tr. 57-58). The VE responded that such an individual could not perform Roberts' past work. (Tr. 58). However, the individual could perform the following light, unskilled jobs: office helper/clerical assistant, DOT 239.567-

10

010, SVP 2, unskilled, light, 82,250 jobs in the national economy; cafeteria attendant, DOT 311.677-010, SVP 2, unskilled, light, 278,470 jobs in the national economy; and mailroom clerk, DOT 209.687-026, SVP 2, unskilled, light, 24,770 jobs in the national economy. (Tr. 58).

The VE also testified that, based on his experience, the threshold for time off-task is ten percent, outside of scheduled breaks. (Tr. 59). In addition, employers will tolerate one absence per month, including arriving late or leaving early. (*Id.*). The VE also testified that if an individual could not handle more than shallow, cursory interactions with their supervisor, they would not be able to sustain competitive employment. (Tr. 59-60). The VE defined shallow and cursory interactions as prohibitive of learning essential functions, responding to supervisor redirection, or responding to questions and answers. (*See* Tr. 60). The VE testified, however, that there is no vocational definition of shallow and cursory. (Tr. 60-61). Likewise, it is not consistent with competitive employment if an individual requires frequent redirection or interaction from a supervisor. (Tr. 61).

**IV.   The ALJ's Decision**

1. The claimant has not engaged in substantial gainful activity since July 6, 2022, the application date (20 CFR 416.971 et seq.).

2. The claimant has the following severe impairments: Obesity and bipolar II, generalized anxiety, post-traumatic stress, and borderline personality disorders (20 CFR 416.920(c)).

3. The claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), but she can never climb ladders, ropes, or scaffolds, she can no more than frequently balance, kneel, and climb ramps/stairs, and she can no more than occasionally stoop, crouch, and crawl. She can perform simple, routine, and repetitive tasks, and make simple work-related decisions, but not at a production rate pace (such as on an assembly line), and she is limited to occasional interaction with

        supervisors, coworkers, and the general public; she can tolerate few changes in a routine work setting.

5. The claimant is unable to perform past relevant work (20 CFR 416.965).

6. The claimant was born on January 25, 1974; therefore, she was 48 years old and defined as a younger individual on the date the application was filed. Since attaining age 50, the claimant has been defined as an individual closely approaching advanced age (20 CFR 416.963).

7. The claimant has a high school education (20 CFR 416.964).

8. Whether or not the claimant has transferable job skills, the framework of the Medical- Vocational Rules support a finding that the claimant is "not disabled" (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. There are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 6, 2022, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-27).

## V.    Law & Analysis

###    A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

12

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision

13

. . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.   Discussion

Roberts brings one issue for this Court's review: whether the ALJ improperly omitted a limitation of "superficial" interaction with others, as opined by the state agency reviewing psychologists. (ECF Doc. 7, pp. 8-14). She argues that the ALJ's explanation that such a limitation was "vague" did not sufficiently explain his reasoning. (*Id.* at pp. 9-10). Rather, a "superficial" interaction speaks to the quality of an interaction, while an "occasional" interaction speaks to the frequency of interaction. (*Id.* at pp. 10-13). In Roberts' view, the unexplained omission from her RFC of a superficial interaction limitation is harmful error and calls into question the reliability of the VE's testimony, as well as results in a violation of the ALJ's requirement to follow SSR 96-8p. (*Id.* at pp. 13-14).

The Commissioner opposes, arguing that substantial evidence supports the ALJ's RFC determination, and that he followed the requirements to sufficiently explain his reasoning when

14

forming the RFC. (ECF Doc. 9, pp. 4-6). As the Commissioner presents, the ALJ reviewed the full record of Roberts' mental health treatment and opinion evidence and properly concluded that the state agency reviewers' opinions were unsupported by the record and were unpersuasive. (*Id.*). With this, the ALJ was not required to include a "superficial" interaction limitation, and the RFC is not in error. (*Id.*).

  For the reasons that follow, I find that the ALJ did not err in his RFC determination.

  As a general matter, the ALJ is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546(c); *Pitrman v. Comm'r of Soc. Sec.*, No. 3:15-cv-1503, 2023 WL 3510752, *13 (N.D. Ohio April 10, 2023). The RFC is an assessment of a claimant's ability to work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011), citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p. In so doing, before proceeding to Step Four of the sequential analysis, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p.

  When considering medical opinion evidence, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive

15

the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

However, an ALJ is not required to adopt all of the limitations suggested in prior administrative medical findings or medical opinions, even if the ALJ has found the prior administrative medical findings or opinions persuasive. *See generally,* 20 C.F.R. §§ 404.1520c; 419.920c. When assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding…[and] and ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).

Even if an ALJ finds a medical opinion fully persuasive, "there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Furthermore, an ALJ is not obligated to explain each limitation or restriction adopted or not adopted. *Pitrman*, 2023 WL 3510752, at *14. "The ALJ is not required to describe the claimant's limitation using the exact language of those medical sources as long as substantial evidence demonstrates that the ALJ adequately portrayed the claimant's limitations in the RFC." *Aerial T. v. Comm'r of Soc. Sec.*, No. 2:23-cv-04188, 2025 WL 798367, at *3 (S.D. Ohio Mar. 13, 2025).

In this case, the ALJ found the opinions of the state agency reviewing psychologists "unsupported and unpersuasive," because "the claimant has repeatedly demonstrated the capacity

16

to adjust to sudden major changes, as a limitation to 'primarily superficial' interaction is vague, and because the record does not suggest that the claimant's interactive difficulties are so severe as to limit her to 'occasional' interaction that is also no 'more than shallow or cursory' in nature." (Tr. 25).

Roberts argues that the ALJ erroneously rejected the state agency psychologists' opinions that she was limited to superficial interactions with others. (ECF Doc. 7, pp. 9-14). With regard to interaction restrictions, the state agency reviewing psychologists opined that Roberts was "capable of interacting with others occasionally and primarily superficially." (Tr. 70, 80). The ALJ's RFC established a restriction limiting Roberts to "occasional interaction with supervisors, coworkers, and the general public." (Tr. 25).

The Sixth Circuit has analyzed whether an ALJ gave proper weight to a psychologists' evaluation that the claimant could relate on a "superficial basis" when the ALJ limited the claimant to "occasional interaction." *Reeves*, at 275. The Sixth Circuit determined that the "occasional" limitation in the RFC was "not inconsistent" with the psychologists' "superficial" limitation. *Haahr v. Comm'r of Soc. Sec.*, No. 3:23-CV-02159-JRK, 2024 WL 3813772, *12 (N.D. Ohio July 3, 2024), *report and recommendation adopted as modified*, No. 3:23 CV 2159, 2024 WL 5242214 (N.D. Ohio Dec. 30, 2024).

Although the Sixth Circuit has not addressed the meaning of these terms since its opinion in *Reeves*, courts remain divided on the meaning of "occasional" and "superficial" interactions. *Haahr,* 2024 WL 3813772 at *12. Courts in this District have pointed out "there is no definition for the term 'superficial interaction' in the Dictionary of Occupational Titles." *Johnson v. Comm'r of Soc. Sec.*, No. 1:22-cv-02272, 2023 WL 8283922, at *15 (N.D. Ohio Nov. 9, 2023) (citations omitted), *report and recommendation adopted*, 2022 WL 8281461 (N.D. Ohio Nov.

17

30, 2023); *Burley v. Commr. of Soc. Sec.,* No. 4:23-CV-00218, 2024 WL 1297554, *6, (N.D. Ohio March 27, 2024) ("The Court declines to adopt our sister District's approach distinguishing superficial and occasional interaction."); *James v. Commr. of Soc. Sec.*, No. 1:22-CV-1915, 2023 WL 417932, *20 (N.D. Ohio June 5, 2023). During Roberts' hearing, the VE confirmed that there is no vocational definition of "shallow and cursory" interactions. (Tr. 60-61).

Deviating from the controlling precedent in this District, courts in the Southern District of Ohio appear to have adopted a vocational term of "superficial" interactions, "which definition is presumed to be qualitatively inconsistent with 'occasional' interactions." *Stephen D. v. Comm'r. of Soc. Sec.,* No. 1:21-CV-00746, 2023 WL 4991918, *7 (S.D. Ohio August 4, 2023), *report and recommendation adopted*, S.D. Ohio No. 1:21-CV-7462024 WL 2204735; *see also, e.g.*, *William H. v. Comm'r of Soc. Sec.*, No. 3:21-cv-219-CHG, 2022 WL 4591304, *4-6 (S.D. Ohio Sept. 30, 2022) (ALJ made reversible error by dismissing "superficial" as lacking vocational definition, despite district precedent defining the term relative to social interactions); *Crisp v. Comm'r of Soc. Sec.*, No. 2:19-cv-2401-MHW-CMV, 2020 WL 581841, *3-4 (S.D. Ohio Feb. 6, 2020) (reversing based on ALJ's "inadequate" rejection of "superficial interactions" as "somewhat ambiguous").

Rather than follow the Southern District of Ohio's approach that distinguishes between superficial and occasional interaction, this Court aligns with those from this District that have remained true to the precedent established by *Reeves*. The fact the ALJ utilized the phrase "occasional" rather than "superficial" interaction with a claimant's supervisors does not draw a distinction void of explanation, and is harmless error. *Haahr,* 2024 WL 3813772, at *12. As there is no requirement for the ALJ to adopt the state agency assessment verbatim, the more relevant inquiry is whether the facts in this case demonstrate that the RFC assessment is not

18

supported by substantial evidence. *Johnson*, 2023 WL 8283922, at *1 citing *Daniels v. Comm'r of Soc. Sec.*, No. 3:19-CV-02946, 2020 WL 6913490, at *10 (N.D. Ohio Nov. 24, 2020).

Here, the ALJ provided the following reasoning when considering the state agency reviewing opinions and forming the RFC:

> With regard to the claimant's residual mental capacity for work, the State agency psychological consultants determined that, in addition to the limitations set forth above, the claimant would be limited to "primarily superficial" interaction with others, and would require "major" workplace changes "to be introduced in advance and then gradually phased in to allow the claimant time to adjust to the new expectations" (2A, 4A). I find these additional limitations unsupported and unpersuasive, as the claimant has repeatedly demonstrated the capacity to adjust to sudden major changes, as a limitation to "primarily superficial" interaction is vague, and because the record does not suggest that the claimant's interactive difficulties are so severe as to limit her to "occasional" interaction that is also no "more than shallow or cursory" in nature (14E/5).

(Tr. 25). I find no error in his explanation.

Roberts offers no evidence that demonstrates how the ALJ's limitation to occasional interactions with others was not supported by substantial evidence, or that the RFC did not properly consider her social interaction limitations. *See Daniels v. Comm'r of Soc. Sec.*, No. 3:19-CV-02946, 202 WL 6913490, *10 (N.D. Ohio Nov. 24, 2020). The ALJ properly accounted for Roberts' impairment in interacting with others when he limited her to occasional interactions with supervisors, co-workers and the general public. *See Schaefer v. Comm'r of Soc. Sec.*, No. 13-10105, 2014 WL 562436, at *2 (E.D. Mich. Feb. 13, 2014) (ALJ's limitation that claimant "must have no more than occasional interaction with the public or co-workers," adequately accounted for the moderate impairments.).

With this, I determine that the ALJ supported the restriction to occasional interactions with substantial evidence and adequately explained his reasoning when assessing the RFC. I therefore recommend the District Court affirm.

**VII.    Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Roberts' application for SSI be affirmed.

Dated: November 20, 2025

Reuben J. Sheperd
United States Magistrate Judge

---

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).