**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **Nakeshua A. Roberts,** | **Case No. 4:25CV00764** |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| | **Magistrate Judge Reuben J. Sheperd** |
| **Commissioner of Social Security** | |
| **Defendant.** | **MEMORANDUM OPINION AND ORDER** |

This matter is before the Court on the Objection of Plaintiff Nakeshua A. Roberts ("Plaintiff" or "Roberts") to the Report and Recommendation of Magistrate Judge Reuben J. Sheperd regarding Plaintiff's request for judicial review of Defendant Commissioner of the Social Security Administration's ("Defendant" or "Commissioner") denial of her application for Supplemental Security Income ("SSI") under the Social Security Act.  (Doc. No. 11.)  For the following reasons, Plaintiff's Objection is overruled, the Report & Recommendation ("R&R") is accepted, and the Commissioner's decision is affirmed.

I.      **Procedural History**

In July 2022, Roberts filed her application for SSI, alleging a disability onset date of January 1, 2014.  (Doc. No. 6 (Transcript ["Tr."] ) at 17. )  The application was denied initially and upon reconsideration, and Roberts requested a hearing before an administrative law judge ("ALJ").  (*Id*.) On January 22, 2024, the ALJ conducted a hearing at which Roberts was represented by counsel and testified.  (*Id*.)  *See also* Tr. 32-62.  A vocational expert ("VE") also testified.  (*Id*.)

On February 12, 2024, the ALJ found that Roberts is not disabled.  (Tr. 17-31.)  The ALJ determined that Roberts suffers from the severe impairments of obesity and bipolar II, generalized

anxiety, post-traumatic stress, and borderline personality disorders.  (Tr. 19.)  The ALJ found that Roberts's impairments do not meet or medically equal the requirements of a listed impairment and that she retains the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b) but with the following exertional and non-exertional limitations: (1) "she can never climb ladders, ropes, or scaffolds, she can no more than frequently balance, kneel, and climb ramps/stairs, and she can no more than occasionally stoop, crouch, and crawl;" and (2) "[s]he can perform simple, routine, and repetitive tasks, and make simple work-related decisions, but not at a production rate pace (such as on an assembly line), and she is limited to occasional interaction with supervisors, coworkers, and the general public; she can tolerate few changes in a routine work setting." (Tr. 20-25.)  The ALJ then concluded that Roberts could perform certain jobs that exist in significant numbers in the national economy and, therefore, is not disabled.  (Tr. 26.)  The Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1-3.)

Roberts seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  (Doc. No. 1.) The case was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636 and Local Rule 72.2(b)(1) for a Report and Recommendation ("R&R").  In the R&R, the Magistrate Judge concludes that the ALJ's decision is supported by substantial evidence and recommends that the decision be affirmed. (Doc. No. 10.)  On December 4, 2025, Roberts filed the following Objection to the R&R:

I.      The ALJ failed to account for the State Agency Psychologists' Opinions.

(Doc. No. 11.)  The Commissioner filed a Response on December 5, 2025.  (Doc. No. 12.)  The Court has conducted a *de novo* review of the issues raised in Roberts's Objection.

## II.       Relevant Medical and Opinion Evidence[1]

### A.       Medical Evidence

Roberts was born in 1974 and was thirty-nine (39) years old on her alleged disability onset date and fifty (50) years old on the date of the ALJ's decision.  (Tr. 26, 64.)  The medical record reflects that, between May 2020 and November 2023, Roberts received mental health treatment for generalized anxiety disorder, depression, bipolar II disorder, post-traumatic stress disorder, and borderline personality disorder.  (Tr. 518-522, 531-572, 580-622, 666-687, 752-796.)  Roberts most often presented for treatment with Kimothy Kane, APRN-CNP.  During this time period, Roberts's treatment notes reflect that she rated her anxiety and depression between a 5 and 10 (on a scale of 10), often rating them at the higher end of the scale (i.e., at a 9 or 10 out of 10).  (Tr. 518, 563, 553, 542, 531,  616, 609,  602, 594-595, 587, 580, 695-696, 688-689, 681-682, 674,  667, 660, 790, 783, 775, 767, 759, 752.)  Roberts reported experiencing panic attacks and/or difficulty sleeping.  (*Id.*)  In addition, she sometimes reported feeling paranoid and/or experiencing audio and/or visual hallucinations.  *See, e.g.*, Tr. 531, 616, 609, 602, 594, 580, 695, 688, 675, 660, 783, 759, 753.

On mental status examination, Nurse Kane consistently noted that Roberts was anxious and exhibited anhedonia, and sometimes remarked that Roberts was paranoid or that she had reported hallucinations.  (Tr. 565, 555, 544, 533, 617, 610, 603, 595, 588, 581, 696, 689, 682, 675, 668, 661, 791, 784, 776, 768, 760, 753.)  However, Nurse Kane's examination findings regarding Roberts's mental status were otherwise largely normal, including (1) normal orientation to time, place, person

---

[1] The Magistrate Judge's thorough recitation of the medical and opinion evidence need not be repeated in full and is incorporated herein.  Rather, for purposes of this Opinion, the Court recites only that evidence which is necessary to resolution of the instant Objection.

& situation; (2) no agitation; (3) appropriate behavior; (4) no compulsive behavior; (5) sufficient fund of knowledge; (6) sufficient language; (7) not in denial; (8) not euphoric; (9) not fearful; (10) no flight of ideas; (11) not forgetful; (12) no grandiosity; (13) not hopeless; (14) no increased activity; (15)  no memory loss; (16) no mood swings; (17) no obsessive thoughts; (18) normal insight; (19) normal judgment; (20) normal attention span and concentration; (21) no pressured speech; and (22) no suicidal ideation.  (*Id.*)

The record reflects that Nurse Kane prescribed Roberts a number of mental health medications (including Klonopin, Latuda, Benztropine, Lamictal, Seroquel, Gabapentin, Effexor, Vistaril, and Venlafaxine) and adjusted the dosages of Roberts's medications depending on her symptoms.  (Tr. 519, 565-566, 555-556, 544-545, 533-534, 619, 612, 606, 598, 590-591, 583-584, 700, 692.)

Treatment records reflect that Roberts's mental health symptoms fluctuated over time.  For example, in December 2021, Nurse Kane remarked that Roberts had elevated depression and anxiety because she was recovering from Covid.  (Tr. 544.)  In March 2022, Roberts reported increased anxiety and depression because she had to get her oldest son out of jail and her younger son was acting out. (Tr. 616.)  The following month, she reported elevated anxiety/depression because it was the anniversary of her mother's death.  (Tr. 609.)  However, in June 2022, Roberts reported that "functioning was not difficult at all" and stated that "she feels she has improved in her symptoms as she is able to handle 'life.'"  (Tr. 602, 607.)  In August and September 2022, Roberts reported increased stress due to financial difficulties, an upcoming home inspection, and her car breaking down.  (Tr. 592, 580-581.)  In October and November 2022, Roberts reported elevated anxiety/depression because she was forced to move and was having difficulty finding affordable housing and dealing with her son's behavioral and mental health issues.  (Tr. 695, 701, 693.)  In

January 2023, Roberts reported that she was  a "train wreck" because her son's father had passed away.  (Tr. 674.)  Nurse Kane noted that "most of [Roberts's] symptoms are situational."  (Tr. 693.)

Roberts continued to report stress regarding her housing issues in late 2022 and early 2023. (Tr. 681, 674.)  She reported to Nurse Kane that she had been seeking assistance from Legal Aid and searching for new housing.  (Tr. 681, 686.)  In March and April 2023, Roberts moved into a new home and reported increased stress associated with the moving process.  (Tr. 667, 665.)  Roberts was also working with her son's case manager to address his behavioral issues and find a different school for him.  (Tr. 666.)  Nurse Kane again noted that Roberts's "anxiety is situational."  (Tr. 665.) Additionally, on several occasions, Nurse Kane noted an increase in Roberts's symptoms due to the fact that Roberts had not taken her medications for several days.  (Tr. 788, 795.)  In August 2023, however, Roberts reported that functioning was "not difficult at all" and stated that she was "overjoyed" because she had a new granddaughter.  (Tr. 775, 781.)  In September 2023, Roberts reported a decrease in anxiety and Nurse Kane noted that Roberts was "not anxious" on mental health examination.  (Tr. 767, 768.)  In November 2023, however, Roberts reported feeling depressed because of the holidays.  (Tr. 752.)

### B.    Opinion Evidence

On October 12, 2022, state agency psychological consultant Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 67) and Mental RFC Assessment (Tr. 69-70).  In the PRT, Ms. Haskins found that Roberts had: (1) mild limitations in understanding, remembering, or applying information; (2) moderate limitations in adapting or managing herself; (3) moderate limitations in interacting with others; and (4) moderate limitations in concentrating, persisting, or maintaining pace.  (Tr. 67.)

In the Mental RFC, Ms. Haskins offered a series of opinions regarding Roberts's mental functional limitations based on her review of Roberts's medical records.  Relevant herein, Ms. Haskins opined that Roberts was "moderately limited" in her abilities to: (1) maintain attention and concentration for extended periods; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (6) respond appropriately to changes in the work setting.[2]  (Tr. 69-70.)  In the narrative portion of the form, Ms. Haskins explained that Roberts was capable of "short cycle step tasks in an environment with no fast pace demand[s]" and "interacting with others occasionally and primarily superficially."  (Tr. 70.)  She further opined that: "[Roberts] can adjust to minor changes in the work setting and still complete an ordinary routine consistently on an independent basis.  Major changes will need to be introduced in advance and then gradually phased in to allow the claimant time to adjust to the new expectations." (*Id*.)

On November 5, 2022, Roberts underwent a consultative examination with Karolis Bauza, M.D.  (Tr. 635-640.)  Dr. Bauza noted that Roberts had a history of fibromyalgia, high blood pressure,

---

[2] Ms. Haskins also opined that Roberts was "not significantly limited" in her abilities to: (1) carry out very short and simple instructions; (2) carry out detailed instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or in proximity to others without being distracted by them; (6) make simple work-related decisions; (7) ask simple questions or request assistance; (8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (9) be aware of normal hazards and take appropriate precautions; (10) travel in unfamiliar places or use public transportation; and (11) set realistic goals or make plans independently of others.  (Tr. 69-70.)

bipolar disorder, and posttraumatic stress disorder.  (*Id*.)  Regarding her bipolar and posttraumatic stress disorder symptoms, Dr. Bauza noted as follows:

> **Bipolar disorder**: The claimant reports a history of bipolar disorder diagnosed in 2021, but states symptoms started a long time ago and due to trauma with her mother dying 3 years ago.  She has trouble sleeping and experiences crying spells.  Appetite is fair.  She is currently on medication for this and attends psychiatric counseling.  She has had suicidal thoughts but denies acting upon them.  The claimant has manic episodes a couple times a month.  The claimant reports that this affects her ability to work secondary to worrying about triggering her symptoms.
>
> **
>
> **Posttraumatic stress disorder**:  The claimant reports a history of posttraumatic stress disorder beginning 3 years ago due to death of her mother.  Current symptoms include nightmares, auditory and visual hallucinations. Symptoms are made worse with hearing whispering.  Nothing improves symptoms.  She does attend counseling.  The claimant reports that this affects her ability to work secondary to [sic] does not like to be around people.

(Tr. 635-636.)   Roberts reported that her daily activities "consist of doing housework, taking care of children, shopping, doing laundry, sweeping, caring for pets and making the bed."  (Tr. 637.) Relevant here, on examination, Roberts was alert and oriented to time, place, person, and situation. (Tr. 638.)  She had good eye contact and fluent speech.  (*Id*.)  Dr. Bauza further noted that Roberts's mood was appropriate and that she had clear thought processes, normal memory, and good concentration.  (*Id*.)

On April 6, 2023, on reconsideration, state agency psychological consultant Daniel Malone, Ph.D., agreed with Ms. Haskins's PRT (Tr. 76-77) and Mental RFC Assessment (Tr. 79-80) and assessed the same limitations.

## III.	The Hearing and the ALJ Decision

### A.	Relevant Hearing Testimony

7

The ALJ conducted a hearing on January 22, 2024.  (Tr. 32-62.)  Among other things, Roberts testified that she graduated from high school and had previous work experience as a customer service representative in a call center and as a self-employed hair and nail technician.  (Tr. 39-43.)  She lived with her 13 year-old son and her 19 year-old daughter.  (Tr. 37.)  Roberts testified that her son suffers from mental disabilities (including autism, oppositional defiant disorder, severe ADHD, and bipolar disorder) and that she stays at home and takes care of him.  (*Id*.)  Roberts testified that she was not working at the time of the hearing and that her only source of income was her son's social security disability benefits.  (*Id*.)

Roberts explained that she had a driver's license but that she had let it lapse about four years ago and had not renewed it.  (Tr. 37-38.)  She testified that she does not drive.  (*Id.*)  Instead, her oldest son (aged 29) drives her to and from appointments when he is not working and she also sometimes gets rides through her health insurance company.  (Tr. 39.)

Roberts testified that she can no longer work due to her fibromyalgia symptoms and her mental health issues.  (Tr. 44.)  Regarding her mental health, Roberts testified that she suffers from anxiety, depression, and PTSD.  (Tr. 44, 46-48, 54.)  Roberts stated that she sees a psychiatrist monthly and takes the maximum dosages of several different mental health medications.  (Tr. 46-47.)  She further testified that she has difficulty sleeping and suffers from panic attacks two to three times per week.  (Tr. 47, 54.)  Roberts also testified that she experiences crying spells and has difficulty paying attention and concentrating.  (Tr. 55.)  Roberts stated that she hears things "all the time," but mainly at night when she is having trouble sleeping.  (Tr. 47.)  She testified that, in addition to her psychiatrist, she also has a counselor/therapist.  (Tr. 48.)  Roberts stated, however, that she had not had an appointment with her therapist in a "couple months."  (*Id*.)

8

Regarding her daily activities, Roberts testified that, the day before the hearing, she had slept most of the day and had woken up at 5:00 p.m.  (Tr. 50.)  She then got something to eat and watched television.  (Tr. 51.)  However, Roberts testified that on a typical day she devotes much of her time to taking care of her 13 year-old son.  (Tr. 50-51.)  She explained that she had switched her son to virtual school and helps him with his homework.  (*Id*.)  Roberts also testified that she schedules, coordinates, and accompanies her son to and from his appointments with his case manager, his care coordinator, and his therapist.  (Tr. 51-52.)  Roberts testified that she goes to the grocery store and that her 19 year-old daughter does most of the cooking.  (Tr. 52-53.)  Roberts stated that she does the laundry and tries to help as best she can with sweeping and mopping.  (*Id*.)  She stated that she generally lays down by 7:00 p.m. each night.  (Tr. 55.)

The VE testified that Roberts had past relevant work as a customer service representative (sedentary, SVP 5) and hair and nail technician (light, SVP 6).  (Tr. 57.)  The ALJ then posed the following hypothetical question to the VE:

> Q:     ** The first hypothetical -- assume a hypothetical individual of the Claimant's age and education.  Further assume the individual is limited – with the past jobs that you've identified -- further assume this individual is limited to light work, with the following additional limitations -- frequent ramps and stairs, no ladders, ropes or scaffolds, frequent balance, occasional stoop, frequent kneel, occasional crouch, occasional crawl, simple, routine and repetitive tasks, but not at a production rate pace, such as assembly line work, simple work-related decisions, occasional interaction with supervisors, co-workers and the public, few changes in a routine work setting. That individual could not perform either of the past jobs. Is that correct?
>
> A:     That is correct, Your Honor.
>
> Q:     Would there be any other work that the hypothetical individual could do?
>
> A:     Yes, Your Honor. So, the list of examples I have -- I'm going to go light, unskilled work examples with the combination of the physical and mental restrictions -- or parameters of that first hypothetical. I have an office helper

9

or a clerical assistant. DOT is going to be 239.567-010. That's an SVP of 2, unskilled. Strength level is light. 82,250 will be a national number. Let's go – the cafeteria attendant DOT is going to be 311.677-010. That's an SVP of 2, unskilled. Strength level is light. 278,470 will be a national number. Third, let's go -- mailroom clerk DOT is 209.687-026. That's an SVP of 2, unskilled. Strength level is light. 24,770 is the national number.

(Tr. 57-58.)  The ALJ then asked how much time off-task and how many absences per months an employer would tolerate.  (Tr. 59.)  The VE testified that "the time off-task threshold is 10 percent off-task outside of scheduled breaks and lunch breaks."  (*Id*.)  Regarding absences, the VE testified that one absence per month is considered "acceptable absenteeism."  (*Id*.)

Roberts's attorney then asked the VE the following follow-up questions:

Q:  Mr. Coleman, in terms of interaction with others – in particular, with supervisors -- if an individual would be unable to handle anything more than shallow or cursory types of interaction with their supervisors, am I correct that this would cause problems in terms of this individual getting through the interview process, the training or probationary period, as well as being able to handle instruction or employee reviews?

A:  Yes. If they go to -- if they're unable to take any specific -- or any interaction or redirection from a managing official or supervisor, even -- primarily, we're looking at in the learning -- in that 30-day probationary period. That's going to impact how the essential functions are learned and performed. So, I -- that's not going to be consistent with a competitive work opportunity.

ALJ:  And Mr. Coleman, how do you define shallow and cursory?

VE:  It's -- shallow and cursory is -- you're learning the essential functions. There's answering of questions. It's going to go -- the shallow and cursory -- that is -- there's -- in learning the essential functions, even though it's an unskilled work opportunity -- in learning or performing those essential functions in the initial 30-day probationary period, there's going to be -- in my experience in the labor market, there's going to be questions and answers. And there's going to be redirection, or more than shallow or cursory interaction that's going to be required.

***

10

> ALJ:   *** And Mr. Coleman, there's no vocational definition of shallow and cursory, is there?
>
> VE:    No, Your Honor. That -- this is -- that's how – my opinion of how the essential functions of the work [are] performed, and how it's learned or the interaction from managing supervisors in today's economy.

(Tr. 59-61.)

### B.    The ALJ Decision

On February 12, 2024, the ALJ issued a decision, finding that Roberts is not disabled.  (Tr. 17-31.)  Relevant here, at step two, the ALJ found that Roberts's bipolar II, generalized anxiety, post-traumatic stress, and borderline personality disorders constitute severe impairments.  (Tr. 19.)  At step three, the ALJ determined that, while these impairments caused moderate limitations in certain respects, they did not (considered singly and in combination) meet or medically equal the criteria of a listed impairment under social security regulations.  (Tr. 20-23.)

In making his step three determination, the ALJ discussed the evidence regarding Roberts's mental health impairments at some length.  The ALJ first explained that Roberts had stopped working "in order to care for both her mother and her youngest son, the latter of whom had been diagnosed with autism spectrum and oppositional defiant disorders; with the stress of caregiving, the passing of her mother in 2019, and the ongoing ability of her son to regularly 'push [her] buttons' and 'the limits,' the claimant by mid-2020 was depressed, irritable, and 'always anxious and on edge.'"  (Tr. 20 (citing 8F/29, 36.)  The ALJ noted that Roberts "thus entered specialized mental health treatment, and her diagnosed mental impairments set forth above have remained under the long-term medication management care of Kimothy Kane, APRN-CNP."  (Tr. 20-21) (citing 3F, 4F, 8F, 9F.)

The ALJ then stated that Roberts's younger son "participated in an online curriculum due to a combination of his symptoms and his numerous doctors' appointments" and that Roberts

11

"acknowledged that she helped with his schoolwork and managed his medications and medical appointments." (Tr. 21.) In addition, the ALJ noted that Roberts "indicated that she did the laundry, that her daughter cleaned the bathrooms, and that they otherwise share the household chores – except that the claimant generally shops and her daughter, a culinary arts student, typically prepares the household meals." (*Id*.)

The ALJ noted that "[Roberts] said that due to her mental impairments, she has panic attacks at home at least 2 to 3 times per week, anxiety when leaving home, crying spells, and difficulty concentrating; she reported poor nighttime sleep resulting in daytime fatigue, but said that she tried not to lie down to rest or nap during the day due to needing to keep an eye her son; and she noted that with 'all of us hav[ing] so many appointments,' she needed to 'write everything down,' as well as occasional reminders." (*Id*.) The ALJ then explained as follows:

> According to the claimant's treatment notes, her younger son's behaviors in late 2021 included running "out of class" and "out of school," as well as running away while they were visiting Pennsylvania, and the claimant acknowledged that her "moods fluctuate[d] according to [the] behaviors of her son"; she allowed that the holidays were difficult due to lost loved ones, and that this particular holiday season was more difficult due to her car breaking down and having "a lot to do," and also because during her episode of covid pneumonia, she "was too weak to get up" or "would forget to take" her psychotropic medications, however, she indicated that once her son's moods were better regulated with medication, "she [would] have more stable moods herself" (3F/14, 36, 46). Though she rated her anxiety at 9/10 and her depression at 10/10, the claimant displayed no agitation, no memory deficits, no mood swings, and normal judgment, insight, attention, and concentration (3F/16, 36, 48).
>
> In March 2022, the claimant reported that "things [were] going ok" despite "a lot of stress" and panic attacks secondary to "family situations" and "worries about finances" and getting the car repaired (4F/37). In June 2022, the claimant rated her [sic] both her depression and anxiety at 9- 10/10, but stated that "functioning [was] not difficult at all," and that she was "able to handle life," and her unchanged and unremarkable clinical presentation supported this self-assessment (4F/29). The claimant reported having "crying spells daily" in June 2022, secondary to "the anniversary date of the miscarriage of her twins," and she noted "seeing white shadows and hearing her name being called when she is under a great deal of stress"; clinically,

12

the claimant remained unchanged and unremarkable, and she remained so despite being "very stressed out" in November 2022 (4F/15-16, 8F).

At that time, the claimant's daughter and younger son were "argu[ing] non-stop," her son was still frequently running away, on one middle-of-the-night elopement a woman "tried to get [him] to get into her truck," her son had also been recently "jumped by 4 other children [and] expelled from school due to threatening to shoot the teacher," and in addition, she had a "bad" roof on her house, which her landlord refused to repair, resulting in the cessation of her Section 8 rental subsidy and, in turn, her "need[] to find a new place to live" (8F/29-49).

**Nevertheless, the claimant maintained the capacity to work with her legal aid representative and case manager, to deal with [the] death of her younger son's father and the "harassment" by her landlord, to find and move to new housing, and to manage the sadness of both the anniversary of her mother's passing and her lack of resources to "do what she want[ed] to" for her son's birthday (8F/1, 8, 15). Even though she had missed an appointment and run out of "some of her meds" in mid-2023, she reported having fewer panic attacks after buying her son a phone, and although she reported feeling overwhelmed with back-to-school and family stress in August 2023, she also reported feeling overjoyed with her new granddaughter, and she acknowledged in October 2023 that her ability to manage her anger had improved (9F/20, 36, 49, 51).**

In November 2023, the claimant complained of "amplified" stress and "intensified" pain after selling her car and moving in order to help with the care of her new granddaughter, but regularly arguing with her son and his girlfriend, as they "made things very difficult for her," particularly as she still had to manage her own home, which was without heat "from Friday through Monday" before being remedied by her landlord (9F/13). **Still, the claimant displayed no agitation, an appropriate affect, no memory deficits or mood swings, no evidence of paranoia, and normal insight, judgment, attention, and concentration (9F/14).**

(Tr. 21-22) (emphasis added).

Based on the above, the ALJ determined that Roberts had (1) mild limitations in understanding, remembering, and applying information; (2) moderate limitations in interacting with others; (3) moderate limitations in concentration, persistence, and pace; and (4) moderate limitations in adaptation/symptom management. (Tr. 22-23.) Regarding her ability to interact with others, the ALJ determined that: "The claimant carries diagnoses inherent within which are anticipated

13

limitations in her capacities to engage appropriately with others and to handle ordinary interpersonal conflict, and her familial relationships reflect these limitations.  However, the claimant has no history of violent or aggressive behavior, she is able to interact appropriately in the community sufficient to accomplish ordinary routine tasks, she has demonstrated the capacity to ask for help when needed, and she maintains the intellectual and emotional abilities to understand and respond appropriately to non-verbal cues and to correction/criticism."  (Tr. 22-23.)

The ALJ then proceeded to assess Roberts's RFC at step four.  After discussing the evidence regarding Roberts's physical impairments, the ALJ noted that Roberts "has a special needs son who also has a history of running away, including in the middle of the night, resulting in mental distress and poor nighttime sleep, and in a tendency to nap while her son is tethered to his online curriculum."  (Tr. 25.) The ALJ found that, as a result, Roberts had "chronic stress," which he described as "reasonably well-managed with medication and treatment."  (*Id.*)  The ALJ then discussed the opinions of Ms. Haskins and Dr. Malone, as follows:

> With regard to the claimant's residual mental capacity for work, the State agency psychological consultants determined that, in addition to the limitations set forth above, the claimant would be limited to "primarily superficial" interaction with others, and would require "major" workplace changes "to be introduced in advance and then gradually phased in to allow the claimant time to adjust to the new expectations" (2A, 4A). **I find these additional limitations unsupported and unpersuasive, as the claimant has repeatedly demonstrated the capacity to adjust to sudden major changes, as a limitation to "primarily superficial" interaction is vague, and because the record does not suggest that the claimant's interactive difficulties are so severe as to limit her to "occasional" interaction that is also no "more than shallow or cursory" in nature (14E/5).**

(*Id.*) (emphasis added).  The ALJ then assessed the following RFC:  "The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), but she can never climb ladders, ropes, or scaffolds, she can no more than frequently balance, kneel, and climb ramps/stairs,

14

and she can no more than occasionally stoop, crouch, and crawl.  She can perform simple, routine, and repetitive tasks, and make simple work-related decisions, but not at a production rate pace (such as on an assembly line), and she is limited to occasional interaction with supervisors, coworkers, and the general public; she can tolerate few changes in a routine work setting." (Tr. 23.)

Based on the testimony of the VE at the hearing, the ALJ concluded that Roberts could not perform her past relevant work but that there are jobs that exist in significant numbers in the national economy that Roberts could perform, including the representative jobs of office helper, cafeteria attendant, and mailroom clerk.  (Tr. 25-26.)  Thus, the ALJ found that Roberts is not disabled under social security regulations.  (*Id*.)  On February 10, 2025, the Appeals Council declined to review the ALJ's decision (Tr. 1-3), making the ALJ's decision the Commissioner's final decision.

**IV.  The Report & Recommendation (Doc. No. 10)**

Roberts filed a Complaint in this Court on April 16, 2025, and the case was referred to Magistrate Judge Sheperd for a Report and Recommendation.  In her Brief on the Merits, Roberts argued that the ALJ erred by failing to "adequately explain a key omission of the state agency reviewing psychologists' medical opinion in the RFC," i.e., the limitation to superficial interaction with others.  (Doc. No. 7.)  Roberts asserted that the ALJ failed to cite "any evidence" in support of his decision not to include this limitation in the RFC.  (*Id*.)  She maintained that "the evidence of record clearly supports the superficial interaction limitation opined by" Ms. Haskins and Dr. Malone, including evidence that Roberts experiences "significant anxiety accompanied with frequent panic attacks, and a heightened level of anxiety around people." (*Id*. at PageID# 840.)  Roberts further asserted that the definition of superficial interaction is not vague, citing an Appeals Council decision

15

in a different case.[3]  Lastly, Roberts argued that the omission of the superficial interaction limitation in the RFC was not harmless "as including it in the RFC could alter the determination of what jobs Ms. Roberts could perform, which would then alter her disability determination."  (*Id*. at PageID# 843.)

The Commissioner disagreed, arguing that substantial evidence supports the ALJ's determination that Roberts was limited to occasional interaction with supervisors, coworkers, and the general public.  (Doc. No. 9.)  The Commissioner asserted that the ALJ more than adequately explained his reasons for omitting a limitation to superficial interaction, noting that "the ALJ considered mental health evaluations from October, November, and December 2021, January, March, and June 2022, and January, March, April, May, July, August, October, and November 2023 where Plaintiff had unremarkable findings and displayed appropriate behavior, appropriate affect, normal speech, no agitation, and no mood swings."  (*Id*. at PageID# 851.)  In addition, the Commissioner argued that "the ALJ noted that the state agency reviewers' finding that Plaintiff was limited to superficial interaction was inconsistent with Plaintiff's ability to work with Legal Aid on housing issues, remain close with her son's father, work with a case manager, shop at stores, and the lack of any history of violent or aggressive behavior with others or in the community."  (*Id*.)

---

[3] The record reflects that Roberts submitted a redacted copy of the AC decision to the ALJ during the administrative proceedings below.  (Tr. 278-282.)  Although redacted, it is clear that the AC decision involves a different claimant.  (Tr. 279-282.)  In the AC Decision, Administrative Appeals Judge Sunmee Jo discusses the opinions of two state agency psychologists who opined (in relevant part) that the claimant in that case should be limited to "no more than occasional, superficial interaction with others."  (Tr. 281-282.)  The ALJ had found these opinions to be "mostly persuasive," but rejected the opinion that the claimant needed no more than superficial interaction with others on the grounds that the term superficial interaction "is not a vocationally proper term."  (*Id*.)  The Administrative Appeals Judge disagreed, finding as follows: "'[S]uperficial interaction' is a term that is readily defined, understood and applicable to a work setting, as it speaks to the depth, kind and quality of social interactions, and indicates that the claimant could not have sustained more than shallow or cursory interactions with others, i.e., coworkers, the general public, and/or supervisors. This term is distinguishable and distinct from 'occasional' which describes the frequency of interaction with others and how much interaction the claimant could tolerate on a sustained basis."  (*Id*.)

16

On November 20, 2025,  Magistrate Judge issued his R&R, in which he recommends that this Court affirm the Commissioner's decision.  (Doc. No. 10.)  Relying on *Reeves v. Comm'r of Soc. Sec.,* 618 Fed. Appx. 267 (6th Cir. 2015), the Magistrate Judge first concluded that there is no inconsistency between an occasional interaction limitation and a superficial interaction limitation and, therefore, "the fact the ALJ utilized the phrase 'occasional' rather than 'superficial' interaction with a claimant's supervisors does not draw a distinction void of explanation, and is harmless error." (*Id*. at PageID# 872.)  The Magistrate Judge then explained that the more relevant inquiry is "whether the facts in this case demonstrate that the RFC assessment is not supported by substantial evidence." (*Id*. at PageID#s 872-873.)  The Magistrate Judge found that the RFC is supported by substantial evidence, finding that "the ALJ properly accounted for the Roberts's impairment in interacting with others when he limited her to occasional interactions with supervisors, co-workers, and the general public."  (*Id*. at PageID# 873.)

Roberts filed an Objection to the R&R on December 4, 2025, to which the Commissioner responded on December 5, 2025.  (Doc. Nos. 11, 12.)

**V.      Standards of Review**

**A.      Review of Objections to R&R**

Under 28 U.S.C. § 636(b)(1), "[a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see Powell v. United States*, 37 F.3d 1499 (Table), 1994 WL 532926 at *1 (6th Cir. Sept. 30, 1994) ("Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to *de novo* review by the district court in light of specific objections filed by any party.") (citations omitted); *Orr v. Kelly*, 2015 WL 5316216

at *2 (N.D. Ohio Sept. 11, 2015) (citing *Powell,* 1994 WL 532926 at *1). *See also* Fed. R. Civ. P. 72(b)(3).  "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. §636(b)(1).

The Sixth Circuit has held that general objections to a Magistrate Judge's report and recommendation are insufficient.  *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir.1995).  *See also Brown v. City of Grand Rapids, Michigan*, 2017 WL 4712064 (6th Cir. 2017).  "A general objection, or one that merely restates the arguments previously presented, is not sufficient to alert the court to alleged errors on the part of the magistrate judge." *Aldrich v. Bock,* 327 F.Supp.2d 743, 747 (E.D. Mich. 2004).  Rather, "[t]he objections must be clear enough to enable the district court to discern those issues that are dispositive and contentious." *Miller,* 50 F.3d at 380 (citing *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508–09 (6th Cir.1991)).  "'[B]are disagreement with the conclusions reached by the Magistrate Judge, without any effort to identify any specific errors in the Magistrate Judge's analysis that, if corrected, might warrant a different outcome, is tantamount to an outright failure to lodge objections to the R&R.'" *Arroyo v. Comm'r of Soc. Sec.*, 2016 WL 424939 at *3 (E.D. Mich. Feb. 4, 2016) (quoting *Depweg v. Comm'r of Soc. Sec.*, 2015 WL 5014361 at *1 (E.D. Mich. Aug. 24, 2015)) (citing *Howard,* 932 F.2d at 509).

Moreover, parties cannot "raise at the district court stage new arguments or issues that were not presented" before the magistrate judge's final report and recommendation.  *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) ("Courts have held that while the Magistrate Judge Act, 28 U.S.C. § 631 *et seq.*, permits *de novo* review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate.").  *See also Swain v. Comm'r of Soc. Sec.*, 379

Fed. Appx 512, 517-18 (6th Cir. 2010) ("A claim raised for the first time in objections to a magistrate judge's report is deemed waived."); *Nasser v. Comm'r of Soc. Sec.,* 598 F.Supp.3d 614, 621 (E.D. Mich. 2022), *aff'd,* 2022 WL 17348838 (6th Cir. Dec. 1, 2022).

### B.      Review of Social Security Decisions

Under the Social Security Act, a disability renders the claimant unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a).  The impairment must prevent the claimant from doing the claimant's previous work, as well as any other work which exists in significant numbers in the region where the individual lives or in several regions of the country.  42 U.S.C. § 423(d)(2)(A).  Consideration of disability claims follows a five-step review process.[4] 20 C.F.R. § 404.1520.

The Court's review of the Commissioner's decision to deny benefits is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by

---

[4] Under this five step review, the claimant must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Before considering step four, the ALJ must determine the claimant's residual functional capacity; i.e., the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 404.1520(e) and 416.930(e).  At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).  *See Abbot*, 905 F.2d at 923.

substantial evidence.  42 U.S.C. § 405(g).  "Substantial evidence is 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *McGlothin v. Comm'r of Soc. Sec.*, 299 Fed. Appx. 516, 521 (6th Cir. 2008) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal citation omitted)).

If substantial evidence supports the Commissioner's finding that the claimant is not disabled, that finding must be affirmed even if the reviewing court would decide the matter differently.  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citation omitted).  A reviewing court is not permitted to resolve conflicts in evidence or to decide questions of credibility. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citation omitted). Moreover, the Commissioner's decision must be affirmed even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

## VI.      Plaintiff's Objection to the R&R

In her Objection, Roberts argues that the Magistrate Judge erred in concluding that the ALJ did not err in failing to include a limitation to superficial interaction with others in the RFC.  (Doc. No. 11.)  Roberts asserts that Magistrate Judge Sheperd "began by claiming that there was no actual error because there was no inconsistency between the state agency psychologists' opinion and the residual functional capacity" and then found that "[b]ecause there was no inconsistency, there was no reason to explain why the limitation was omitted." (*Id*. at PageID# 876.)  Roberts maintains that Magistrate Judge's determination that the terms "occasional" and "superficial" are not inconsistent with each other "flies in the face of the record evidence." (*Id*.)  Specifically, Roberts notes that both

Ms. Haskins and Dr. Malone found that Roberts was capable of interacting with others "occasionally *and* primarily superficially," implying that these terms encompass different concepts. (*Id*. at PageID# 877) (emphasis in original). Moreover, Roberts asserts that "the ALJ and the way he wrote the decision clearly reveals that the ALJ believed the two terms to be different from one another – inconsistent with one another." (*Id*.)

Roberts next argues that *Reeves* in distinguishable from the instant case because, in that case, the state agency psychologists did not limit the claimant to "occasional" *and* "superficial" interaction, as Ms. Haskins and Dr. Malone did in this case. (*Id*. at PageID# 878.) Lastly, Roberts argues that the ALJ's decision to omit a limitation to superficial interaction in this case is not supported by substantial evidence because "the ALJ did not provide any sort of analysis" in support of this conclusion. (*Id*.) Roberts maintains that "[w]hile the ALJ did not have to accept the limitation to 'superficial' interaction, the ALJ did need to explain why the limitation was being omitted" and, here, "the mere cursory declaration that such a limitation was not warranted should be deemed insufficient." (*Id*. at PageID# 878-879.)

In response, the Commissioner argues (summarily) that Roberts's "Objections fail to show any error on the part of the Magistrate Judge, and they should be rejected." (Doc. No. 12.)

At Step Four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). When there is an opinion from a medical source or prior administrative medical finding about a claimant's capabilities, an ALJ must explain how persuasive the ALJ finds that opinion or finding.[5] *See* 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

---

[5] The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to

21

*See also Reeves*, 618 Fed. Appx at 275.   Importantly, "[a]n ALJ need not incorporate every limitation from a medical source's recommendation, even if it finds that medical source to be persuasive." *Kinney v. Comm'r of Soc. Sec.,* 2024 WL 2273365 at * 3 (6th Cir. May 20, 2024).  *See also Reeves,* 618 Fed. Appx at 275 ("[E]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx 149, 157 (6th Cir. 2009) (finding that, when assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding… [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding.")

However, under Social Security Ruling ("SSR") 96-8p, if the ALJ's "RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted."  SSR 96-8p, Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 at * 7  (July 2, 1996).  *See also Echevarria v. Comm'r of Soc. Sec.*, 2025 WL 3470314 at * 6 (N.D. Ohio Dec. 3, 2025); *Bobak v. Comm'r of Soc. Sec.*, 2025 WL 2664461 at * 11 (N.D. Ohio Sept. 18, 2025), *report and recommendation adopted by* 2026 WL 281039 (N.D. Ohio Feb. 3, 2026).  The reasons for the ALJ's conclusions about the medical opinions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion.  *Stacey v. Comm'r of Soc. Sec.,* 451 Fed. Appx 517, 519 (6th Cir. 2011).

---

support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).  The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions."  *See id*. at §§ 404.1520c(b)(2), 416.920c(b)(2).

In the instant case, Roberts first objects to the Magistrate Judge's conclusion that the ALJ was not required to explain why he omitted a limitation to superficial interactions in the RFC, because there is no conflict between the terms superficial and occasional.  As discussed below, district courts in this Circuit are divided on this issue.

The first step in determining whether there is a conflict between the terms superficial and occasional is examining the meaning of each of those terms.  The Social Security Administration ("SSA") has defined certain terms and concepts that are often used in evaluating disability, including (notably) the term occasional, which is defined as meaning "from very little up to one-third of the time."  SSR 83-10, 1983 WL 31251 at * 5 (Jan. 1, 1983).  The SSA has not, however, defined the term superficial, in either the Social Security Act or any of its corresponding regulations, SSRs, policies, or manuals.  *See, e.g., Bobak,* 2025 WL 2664461 at * 10; *Tammy W. v. Comm'r of Soc. Sec.,* 2024 WL 4284251 at * 4 (S.D. Ohio Sept. 25, 2024).  Moreover, although the Dictionary of Occupational Titles ("DOT") defines numerous vocational terms related to interacting with others (including "mentoring," "negotiating," "instructing," "supervising," "diverting," "persuading," "speaking-signaling," "serving," and "taking instructions-helping"), it does not define the term "superficial" as it may relate to any of those terms.  *See Bobak,* 2025 WL 2664461 at * 11 (citing DOT, App'x B, http://occupationalinfo.org/appendxb1.html).  *See also Stoodt v. Comm'r of Soc. Sec.,* 2022 WL 721455 at * 16-17 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted by* 2022 WL 716105 (N.D. Ohio Mar. 10, 2022) (noting that neither the DOT nor the Selected Characteristics of Occupations ("SCO") define the term "superficial").

As noted *supra,* in her Brief on the Merits, Roberts argued that the Appeals Council has not only defined the term superficial, but has concluded that the terms superficial and occasional are

definitionally distinct.  (Doc. No. 7 at PageID# 841.)  In support of this argument, Roberts directed the Court's attention to a redacted copy of an Appeals Council decision ("the July 2022 AC Decision") dated July 27, 2022, in which an Administrative Appeals Judge discusses the meaning of the terms superficial and occasional interaction in the context of a different, unidentified claimant's social security application. (*Id.*) (citing Tr. 282.)

The Court finds Roberts's reliance on the July 2022 AC Decision to be misplaced.  Numerous district courts within this Circuit (including this Court) have rejected the argument that the AC Decision at issue herein constitutes binding authority in unrelated social security appeals.  *See Muoio v. Comm'r of Soc. Sec.,* 2026 WL 468557 at * 11 (N.D. Ohio Feb. 19, 2026) (Barker, J.); *Bobak*, 2025 WL 2664461 at * 10 ("The Appeals Council's definition in a remand order for [an] unrelated case does not constitute an official definition by the SSA that is binding on it at large or on this Court.") (collecting cases); *Dallas B. v. Comm'r of Soc. Sec.*, 2025 WL 3710871 at * 5 (S.D. Ohio Nov. 7, 2025) (same), *report and recommendation adopted by* 2025 WL 3709000 (S.D. Ohio Dec. 22, 2025); *Jared W. v. Comm'r of Soc. Sec.*,  2022 WL 17842947 at *6 (S.D. Ohio Dec. 22, 2022), *report and recommendation adopted by* 2023 WL 1960600 (S.D. Ohio Feb. 13, 2023) (same).  The Court agrees and, accordingly, finds Roberts's reliance on the July 2022 AC Decision to be misplaced.

In the absence of an established definition of the term superficial, district courts within this Circuit remain divided over whether there is a conflict between the terms superficial and occasional in the context of social interaction limitations.  Relying on the Sixth Circuit's decision in *Reeves,*[6]

---

[6] In *Reeves*, two state agency psychologists opined that the plaintiff was moderately limited in his ability to interact appropriately with the public and is "able to relate to a few familiar others on a superficial basis." *Reeves*, 618 Fed. Appx. at 275.  The ALJ assigned their opinions "great weight," but then translated the opinions that plaintiff could "relate to a few...on a superficial basis" into an RFC limitation to "only occasional interaction with the public." *Reeves v. Colvin*, 2014 WL 4675321 at *4, 8 (N.D. Ohio Sept. 18, 2014).  Before both the district court and the Sixth Circuit, the plaintiff

24

some district courts have found that the term occasional does not conflict with the term superficial (particularly in the context of unskilled work) and therefore an ALJ need not explain his or her reasons for applying one term over the other.  *See, e.g., Stephen D. v. Comm'r of Soc. Sec.*, 734 F.Supp.3d 729, 739 (S.D. Ohio 2024); *Martin v. Comm'r of Soc. Sec.*, 2025 WL 3153381 at * 2 (W.D. Mich. Nov. 12, 2025); *Chermagne W. v. Comm'r of Soc. Sec.,* 2025 WL 1993507 at * 6-7 (S.D. Ohio July 17, 2025).

Other district courts, however, have held that the terms are not interchangeable because occasional relates to the frequency or quantity of time a claimant spends interacting with others, whereas superficial relates to the quality of the interactions.[7]  *See, e.g., Hutton v. Comm'r of Soc. Sec.*, 2020 WL 3866855 at * 4 (S.D. Ohio July 9, 2020), *report and recommendation adopted by,* 2020 WL 4334920 (S.D. Ohio July 28, 2020); *William H. v. Comm'r of Soc. Sec.*, 2022 WL 4591304

---

argued that the RFC limitation to occasional interaction was inconsistent with the ALJ's acceptance of the psychologists' opinions limiting plaintiff to superficial interactions. The Sixth Circuit rejected that argument as "without merit," concluding that "the ALJ's mental RFC determination was supported by substantial evidence in the record and *is not inconsistent with either of the state agency psychologists' opinions*." *Id*. (emphasis added).

[7] A recent (albeit unreported) decision of the Sixth Circuit may lend some support to this latter view.  In *Mabry-Schlicher v. Comm'r of Soc. Sec.*, 2025 WL 1604376 (6th Cir. June 6, 2025), the district court had previously remanded the case to the ALJ on the grounds that the ALJ had improperly rejected the opinions of state agency psychologists that plaintiff was limited to superficial contact as "vocationally irrelevant;" and instead only limited plaintiff to occasional interaction with coworkers and supervisors.  *Id*. at *2.  On remand, the ALJ included a limitation in the RFC to "superficial contact," which the ALJ defined as "retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice."  *Id*.  On appeal, plaintiff argued that the ALJ had failed to comply with the district court's remand order and that the ALJ's definition of "superficial contact" was impermissibly narrow.  The Sixth Circuit rejected both arguments.  First, the Sixth Circuit rejected the argument that the ALJ had failed to comply with the remand order, noting that "the social restrictions [in the superficial contact limitation] relate to the quality and character of social interaction, rather than mere duration of interaction, and thus comport with the remand order."  *Id*. at * 4. The Sixth Circuit then rejected the plaintiff's argument that the ALJ's "superficial contact" limitation was overly narrow, finding that the term superficial is undefined by social security regulations and guidance and that "[l]acking extensive guidance, the ALJ delineated specific social restrictions based on his understanding of what a 'superficial contact' limitation requires in this context."  *Id*. at * 5.  Although the Sixth Circuit does not directly address the issue of whether superficial and occasional are distinct terms with different meanings, it does appear to recognize a distinction between the terms superficial and occasional, i.e., that the term superficial interaction relates to the *quality* of interactions, as opposed to (and distinct from) "mere *duration* of interaction," which is often associated with occasional interaction.  *Id*. at * 4.

25

at * 5 (S.D. Ohio Sept, 30, 2022); *Lindsey v. Comm'r Soc. Sec.*, 2018 WL 6257432 at *4 (S.D. Ohio Nov. 30, 2018), *report and recommendation adopted by* 2019 WL 133177 (S.D. Ohio Jan. 8, 2019).

The Court need not decide this issue.  Assuming *arguendo* that there is a conflict between the terms superficial and occasional, the Court finds that the ALJ adequately explained his reasons for omitting a limitation to superficial contact with others from the RFC and, further, that the ALJ's reasoning is supported by substantial evidence.

In his decision, the ALJ expressly acknowledged the opinions of Ms. Haskins and Dr. Malone that Roberts is limited to "primarily superficial" interaction with others.  (Tr. 25.)  The ALJ explained, however, that he found that this "additional limitation" was "unsupported and unpersuasive" because (1) a limitation to "primarily superficial" interaction is vague; and (2) "the record does not suggest that the claimant's interactive difficulties are so severe as to limit her to 'occasional' interaction that is also no 'more than shallow or cursory' in nature."  (*Id.*)  For the following reasons, the Court finds that the ALJ's decision is supported by substantial evidence.

As set forth *supra*, earlier in the decision (at step three), the ALJ discussed Roberts's symptoms and her mental health treatment records at length.  (Tr. 20-23.)  While the ALJ acknowledged Roberts's anxiety, panic attacks, crying spells, and fatigue, the ALJ expressly noted that Roberts nonetheless maintained the capacity to "work with her legal aid representative and case manager;" deal with harassment by her landlord; and "find and move to new housing."  (Tr. 22.)  The ALJ also noted that, even when Roberts reported very high levels of anxiety and depression, she displayed normal mental status examination findings, including no agitation, no memory deficits, no mood swings, and normal judgment, insight, attention, and concentration.  (Tr. 21, 22.)  In addition, the ALJ noted that, despite her mental health symptoms, Roberts reported that she retained the

26

capacity to help with her son's schoolwork, manage his medications and medical appointments, and do some household chores.  (Tr. 21.)  The ALJ further found that Roberts (1) has no history of violent or aggressive behavior; (2) is "able to interact appropriately in the community sufficient to accomplish ordinary routine tasks;" (3) has "demonstrated the capacity to ask for help when needed;" and (4) "maintains the intellectual and emotional abilities to understand and respond appropriately to non-verbal cues and to correction/criticism." (Tr. 22-23.)  Lastly, at step four, the ALJ acknowledged that Roberts experiences "chronic stress" but found that it was "reasonably well-managed with medication and treatment." (Tr. 25.)

Although the ALJ did not repeat all of the above information in the specific paragraph of his decision evaluating the opinions of Ms. Haskins and Dr. Malone, he was not required to do so.  As the Sixth Circuit has explained, an ALJ is permitted to rely on previously articulated information to support his analysis of opinion evidence.  *See, e.g., Crum v. Comm'r of Soc. Sec.*, 660 Fed. Appx. 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion").  *See also McCarty v. Comm'r of Soc. Sec.*, 2024 WL 4695900 at * 8 (N.D. Ohio Nov. 6, 2024) (noting that "the ALJ's decision must be read as a whole and with common sense"); *Bryant v. Comm'r of Soc. Sec.,* 2019 WL 5684456 at *10 (N.D. Ohio Nov. 1, 2019) ("Although the ALJ must discuss significant evidence supporting her decision and explain her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which she relied into a single paragraph.").

27

With this in mind, and reading the ALJ decision herein as a whole, the Court finds that substantial evidence supports the ALJ's decision to omit a superficial interaction limitation in the RFC.  As set forth above, the ALJ adequately explained the reasons why he found Ms. Haskin's and Dr. Malone's opinions that Roberts is limited to "primarily superficial" contact with others, to be "unsupported and unpersuasive." (Tr. 25.)  The ALJ's reasoning is supported by substantial evidence in the record, including evidence that Roberts (1) consistently exhibited largely normal mental status examination findings, including during periods of elevated stress; and (2) maintained the capacities to communicate and work with Legal Aid regarding her housing situation, work with her son's case manager, and manage her son's medical appointments and medications.

Accordingly, and for all the reasons set forth above, Roberts's Objection is overruled.  The Court agrees with the Magistrate Judge that the Commissioner's decision should be affirmed.

## V.      Conclusion

For all of the foregoing reasons, Plaintiff's Objection (Doc. No. 11) is overruled.  The Court accepts the Magistrate Judge's Report and Recommendation (Doc. No. 10), and the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

 *s/Pamela A. Barker*
PAMELA A. BARKER

Date:  June 2, 2026                                U. S. DISTRICT JUDGE

28